## Case No. 3,975.

### The DOLPHIN.

[Betts, Pr. Cas.]

District Court, S. D. Florida. 1863.

Prize—Blockade—Contraband — Illegal Voyage—Stop at Neutral Port—Evidence.

[1. The act of knowingly sailing for a blockaded port, with intent to enter therein, is an attempt to break the blockade, rendering the ves-

·sel and the cargo liable to capture in any part of the voyage.]

[Cited in The Stephen Hart, Case No. 13,-364.]

[2. The offense of attempting to carry contraband of war to the enemy is complete at the moment when a vessel begins her voyage for that purpose, and she is from that time liable to capture.]

[3. The voyage of a vessel to a blockaded port, although broken by a stop at a neutral port, is one continuous illegal voyage.]

[4. A vessel suited by size and construction for blockade-running was captured on her way from Liverpool to Nassau with arms (described in the freight list as "hardware") and cotton cards, as a part of her cargo. Her master, mate, and cook swore that the voyage was to end at Nassau, and the vessel to be turned over to the consignees, and that the crew were engaged for only three months. Letters from the owner to the consignees, found on board, indicated that she was to be used between Nassau and Mexico, or Nassau and Canada or New York. Another letter was discovered, directing consignees not to discharge any of her cargo at Nassau, but to put on more. The cargo was of a kind not marketable at Nassau. Held, that the evidence showed an intent to carry the cargo to a blockade port in the rebellious states, and that vessel and cargo were lawful prize.]

[Prize proceedings by the United States against the steamer Dolphin and her cargo (William J. Grazebrook, claimant). Decree of condemnation.]

MARVIN, District Judge. This steamer, of the net burthen of one hundred and twenty-nine tons, Eustace, master, was captured by the United States vessel Wachusett, near the island of Porto Rico, while ostensibly prosecuting a voyage from Liverpool to Nassau. A claim to the vessel and cargo has been exhibited by the master, on behalf of William J. Grazebrook, a merchant, residing in Liverpool, who, it appears, shipped the whole cargo, and consigned it, by the bills of lading, to his own order, and, by the freight bill accompanying it, to Messrs. Chambers & Raw, of Nassau. Surveyors, appointed by the court to examine the cargo, which consists of a general assortment, report that it corresponds, in the number of packages, their marks and contents, with the freight list found on board, except as to forty-six cases, which contain rifles, and twenty cases, which contain cavalry swords, all of which are classed in the freight list as "hardware." Each case of rifles contains twenty rifles, and each case of swords one hundred and twelve swords. Thirteen small boxes, containing cotton cards, were found on board, which are not on the freight list; also, one box of paint brushes. If we suppose the vessel and cargo to be owned as claimed, and that there was no intention on the part of the owner that the vessel should proceed with the cargo to a port of the enemy, then there would be no ground whatever to justify the capture or condemnation of either of them. Subject to the right of belligerent cruisers to visit and search merchant vessels, to ascertain their neutral or hostile characters, and the characters of their cargoes, and the legality of their voyages, neutrals possess an undisputed right to trade and carry on commerce among themselves in any kinds of merchandise they please, whether of the nature of contraband of war or not. Indeed, there can be no such thing as articles contraband of war in a strictly neutral trade. But if, on the other hand, it was the intention of the owner that the vessel should simply touch at Nassau, and should proceed thence to Charleston, or some other port of the enemy, then the voyage was not a voyage prosecuted by a neutral from one neutral port to another, but was a voyage to a port of the enemy, begun and carried on in violation of the belligerent rights of the United States to blockade the enemy's ports and prevent the introduction of munitions of war. The act of sailing for a blockaded port, with the knowledge of the existence of the blockade, and with an intent to enter, is itself an attempt to break it, which subjects the vessel and cargo to capture in any part of the voyage. The Columbia, 1 C. Rob. Adm. 154; The Neptunus, 2 C. Rob. Adm. 110. So, also, the offence of attempting to carry articles contraband of war to the enemy is complete, and the vessel liable to capture, the moment she enters upon her voyage. The Imina, 3 C. Rob. Adm. 167. The offence consists in the act of sailing, coupled with the illegal intent. The cutting up of a continuous voyage into several parts, by the intervention, or proposed intervention, of several intermediate ports, may render it the more difficult for cruisers and prize courts to determine where the ultimate terminus is intended to be; but it cannot make a voyage which, in its nature, is one, to become two or more voyages, nor make any of the parts of one entire voyage to become legal, which would be illegal if not so divided. When the truth is discovered, it is according to the truth, and not according to the fiction, that the question is to be determined. The Maria, 5 C. Rob. Adm. 365; The William, Id. 385; The Richmond, Id. 325; The Thomyris, Edw. Adm. 17.

It is argued, that it was lawful for the vessel to go to Nassau, notwithstanding the existence of an intention that she should proceed thence to Charleston; for the reason that, until after she had entered on the last stage of her voyage, the whole matter rested in possibility merely,—in intention only, and not in act,— and that the intention to commit an offence in futuro is not tantamount in law to its actual commission in praesenti. But this argument begs the whole question. It was not lawful for the vessel to go to Nassau, with an intention of continuing the voyage thence to Charleston in a direct course, without going to Nassau at all. The fallacy consists in supposing, that there is something in the intention to stop at a neu-

tral port, which, in itself, is innocent enough, that will extinguish the illegality of an additional guilty intention to proceed on, beyond such a port, to a blockaded port, and thus legitimatize the first stage of the voyage. But the voyage is one, from the port of lading to the port of delivery, and, if unlawful in any part, is unlawful throughout.

It is also argued, that a locus penitentione existed until the vessel had departed from Nassau, on her voyage to a blockaded port; and that the voyage might be ended there, or changed to a lawful port. But this argument will apply with equal force to a voyage in which no intermediate port is intended to be interposed. The owner or master may, in any case, in port or in the middle of the ocean, abandon the illegal · purpose, and change the voyage. If this be done voluntarily, before capture, the original offence is extinguished, and the vessel will be restored; but, if the illegal purpose exists at the time of capture, the vessel is taken in delicto, whether the voyage is prosecuted in a direct course or circuitously. If the illegal purpose is shown to exist at the inception of the voyage, it will be presumed to exist up to the time of capture, unless it is satisfactorily shown that the purpose had been abandoned and the voyage changed. The Imina, 3 C. Rob. Adm. 167.

Let us see now what the testimony is in relation to the fact of the existence of an intention, at the time of capture, that the vessel should proceed to a blockaded port. The master, in his affidavit made in support of the claim, swears, "that said voyage, of his own positive knowledge, would have terminated at Nassau, N. P., had said voyage not been arrested by the capture aforesaid; that this deponent's instructions were positive and unconditional, requiring him to proceed to Nassau, and deliver said steamer to Chambers & Raw; that, when he had so delivered said steamer, this deponent's connection with said steamer ceased; that he had no further command or control over the same; and he further says, that, of his own knowledge, said voyage was to end at Nassau." Prize courts often have occasion to echo the remark made by Sir William Scott, in delivering his opinion in the case of The Odin, 1 C. Rob. Adm. 252: "It is a wild conceit that any court of justice is bound by mere swearing; it is the swearing credibly that is to conclude its judgment." The master does not tell us how he acquired such positive knowledge of the intentions of the owner, nor show us any written instructions to end the voyage at Nassau, or to deliver the vessel· to Chambers & Raw, nor tell us what disposition or use was to be made of the vessel or cargo after arriving at that port. Vincent Lazzalo, the mate, swears that the voyage would have ended at Nassau, had the vessel not been captured. Banning, the purser, swears that the vessel would have been subject, at Nassau, to the orders of Chambers & Raw, the consignees. Leefe, the cook, thinks the vessel would have returned from Nassau to Liverpool. The other witnesses generally concur in saying, that they do not know what port the vessel would have gone to, after leaving Nassau. The captain says that "the crew were shipped in Liverpool for a voyage to Nassau, to be thence sent home to England, for a period not exceeding three months." The mate says that the captain hired him at Liverpool, for a voyage from Liverpool to Nassau, for twelve pounds per month and his passage home, the wages to go on until he arrived back in Liverpool. The shipping agreement states that the voyage was to be "from Liverpool to Nassau, calling at any ports and places in the Atlantic ocean and West Indies, and back to a final port of discharge in the United Kingdom, the term not · to exceed three months." Now, it is hardly credible that this vessel was to end her voyage at Nassau. For what was she going, and how was she to be employed there? It is not suggested that she was going there for sale. Was she to be employed in making short voyages, suited to her capacity, to and from blockaded ports, which so many or a'l of the other steamers of about her size, which have lately come out from England to Nassau, have been employed in making, until captured? Except such voyages, it would be difficult to think of any trade she could engage in at Nassau, or at any other port in the West Indies, by which she could defray the expenses of running. What was to be done with the cargo. It was to be delivered to Chambers & Raw. But what were they to do with it? Nassau furnishes no market for any such cargo as this. It is a small town. The adjacent islands possess but a small population, dependent on it for supplies. Probably not three merchant steamers ever arrived at that port from any part of the world until after the present blockade was established, except the regular government mail steamers. Was her cargo to be sold in Nassau, including the 920 rifles and the 2,240 swords? These are questions which it is not unreasonable that a prize court should ask, and expect some reasonable solution of, in a case like this.

But, fortunately. the court is relieved of the labor of considering any further the testimony furnished by the shipping agreement and by the depositions of the master and crew; or of weighing any more accurately the presumptions and probabilities which arise in the case, as to the ulterior destination of the ship and cargo. There is other· testimony in the case, furnished by Mr. Grazebrook himself, which seems to the court to be conclusive. Three letters of his were found on board, and are in evidence before the court. One of them is as follows: —"Per Dolphin, Liverpool, Feb. 6, 1863.— Messrs. Chambers & Raw, Nassau: Dear

Sirs,—This will be handed you by Captain Eustace. I hope the cargo will have arrived in good condition, and will be found suitable for the requirements of the place. I have sent more crockery than we intended, and it has filled up the ship. I think they have sent too many chambers for the assortment. However, the goods are very much according to your specifications sent me from time to time. I am a little afraid your market may be overdone from New-York and the states. If the French charter for the army stores, rum, &c., has fallen through, I fancy a fine trade is to be done between Nassau and Boston and New-York, or it may be the Canadas, if this war continues, and coal must be greatly wanted for the blockade runners. You might arrange for a return cargo of coal from Prince Edward's Island. I have no doubt you will find plenty of good employment for my steamer. If the Federals, or any one, will pay a right down handsome sum for her, I might sell her; but I will have none of your Federal or Confederate paper in exchange for my tight little ship. It must be hard cash. Yours truly, W. J. Grazebrook."

One of the letters, bearing the same date as the above, was addressed to the master; and, after instructing him upon the subject of procuring coals at Maderia and St. Thomas, for his voyage out to Nassau, the writer says: "I expect the French army at Vera Cruz will want rum and many articles which you may obtain, after discharging at Nassau. I am sure good trade is to be done in those latitudes, after we have got rid of your present cargo. Coals, also, are sure to be wanted at Nassau, and the coals at Prince Edward's Island are good and cheap—cost fifteen shillings per ton. Messrs. Chambers & Raw will probably have the charter arranged for the French government they wrote about; if not, you must find, in concert with them, some profitable employment. Perhaps trading between Boston or New-York, with goods for the Nassau market, would pay well."

Now, these two letters do not say a word about ending the voyage at Nassau, or paying off the crew, or returning them to England. They were evidently given to the master, not as instructions to him, or to Messrs. Chambers & Raw, but in order to be shown to cruisers, in case the vessel should be visited by any of them. They were a blind, a pretence, intended to deceive, and to convey the idea that the vessel was to be employed in some lawful trade. But the intention of the writer was not cleverly executed. Very few, if any, of our cruisers, would be apt to believe that a steamer no larger than this was to be employed in carrying coals from Prince Edward's Island to Nassau,—a voyage on which she could hardly carry coals enough for her own consumption,—or in carrying rum to the French army, or in trading between Boston or New-York and Nassau.

But there was a third letter, which was not intended to be shown to the cruisers, dated four days later, and addressed to Messrs. Chambers & Raw. Its contents were probably unknown to the master, for, had he known the contents, it is quite likely it would not have fallen into the hands of the captors. It reads as follows: "Per Steamer Dolphin, Liverpool, Feb. 10, 1863. Messrs. Chambers & Raw, Nassau, Dear Sirs: I addressed you the 6th of February, for a certain reason. I now beg to cancel those instructions entirely, and, of course, my vessel is not to be sold to any one. I shall be sending you a power of attorney, for certain purposes, by next mail this week. I hope you will be able to get some more goods on, instead of taking any off, and at good rates. I am, dear sirs, yours truly, W. J. Grazebrook. P. S.—I send various letters to forward." So, it appears, that Mr. Grazebrook did not intend that his vessel should be sold at Nassau, nor that she should end her voyage there. She was to go from Nassau somewhere. More goods were to be put on, instead of taking any off. The studied effort to conceal the ulterior destination; the swords and rifles found on board, and denominated, in the freight list, "hardware;" the almost certain impossibility of employing a steamer of this class and size in any trade in this part of the world, by which she could earn even her expenses, other than in the trade and business of violating the blockade; all point, with unerring certainty, to Charleston or Wilmington, as the ulterior destination of the vessel and cargo. Condemnation of ship and cargo follows, of course.

The view that I have taken of the case renders it quite unnecessary to call for further proof of neutral ownership, or to inquire whether this cargo, or a large part of it, may not be owned by enemies. The fact that there are twenty-three different sets of bills of lading among the papers of the vessel, and as many different shipping marks upon the packages and in the freight list, raises a supicion, to say the least, that Mr. Grazebrook is not the sole owner. No invoices of the cargo were found on board, nor the various letters referred to in the postscript to Mr. Grazebrook's letter. The claimant may be allowed any reasonable length of time to consult counsel, and determine whether he will appeal or not.